# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2022     Decided November 22, 2022

No. 21-1270

IN RE: CENTER FOR BIOLOGICAL DIVERSITY AND CENTER FOR
FOOD SAFETY,
PETITIONERS

FMC CORPORATION AND SYNGENTA CROP PROTECTION, LLC,
INTERVENORS

———

On Petition For Writ of Mandamus

———

*Stephanie M. Parent* argued the cause for petitioners. With her on the petition for writ of mandamus and the reply was *Jonathan C. Evans*.

*Kamela A. Caschette*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the opposition to the petition for writ of mandamus were *Todd Kim*, Assistant Attorney General, and *Patrick R. Jacobi*, Attorney.

*Thomas A. Lorenzen* argued the cause for intervenors. With him on the response to the petition for writ of mandamus were *Kirsten L. Nathanson* and *Elizabeth B. Dawson*. *Amanda S. Berman* entered an appearance.

2

Before: MILLETT and RAO, *Circuit Judges*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* TATEL.

TATEL, *Senior Circuit Judge*: Eight years ago, the Environmental Protection Agency registered a new pesticide without first determining, as required by the Endangered Species Act, whether it would have an adverse effect on endangered species. Then, five years ago, our court ordered EPA to fulfill that statutory obligation. Notwithstanding Congress's mandate and our order, EPA has failed to make the required determination. Now, the Center for Biological Diversity and the Center for Food Safety seek the only legal relief left that would force EPA to comply with the statute: a writ of mandamus. For the reasons set forth below, we shall grant the writ.

## I.

Two statutes lie at the heart of this case: the Endangered Species Act (ESA) and the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).

The ESA, a broad decree to all executive agencies, requires them to consult with either the National Marine Fisheries Service or the Fish and Wildlife Service ("the Services") to "insure that any action authorized, funded, or carried out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in [their habitats'] destruction." 16 U.S.C. § 1536(a)(2). If this seems a heavy burden for agencies to carry, that is by design: Congress "struck [the balance] in favor of affording endangered species the highest of priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194 (1978).

3

An agency's first step toward ESA compliance is an effects determination, an initial review to determine whether a proposed action "may affect" an endangered species or its habitat. 50 C.F.R. § 402.14(a). If the agency finds that its proposed action will "not affect any listed species or critical habitat" in any way, then it need not consult the Services. *Center for Biological Diversity v. Department of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009). But if it finds that the proposed action may affect an endangered species, then it must consult. 50 C.F.R. §§ 402.14(a); 402.13(a). This required consultation is critical because it includes inter-agency consideration of what plausible mitigation measures could be implemented to avoid adverse effects on endangered and threatened species. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Consultation, then, provides a roadmap forward that balances accommodating agency priorities with maintaining ESA compliance. *See* 50 C.F.R. § 402.14(h)(2).

The second statute, FIFRA, regulates the sale and distribution of pesticides. No pesticide may be sold in the United States unless it is first registered with EPA. 7 U.S.C. § 136a(a). After receiving an application to register a pesticide, EPA must approve the application if it meets composition and labeling requirements and will "perform its intended function without unreasonable adverse effects on the environment" if used in accordance with widespread practices. 7 U.S.C. § 136a(c)(5). An EPA order registering a pesticide following notice-and-comment—like the one at issue in this case—may be challenged only in this court. *Center for Biological Diversity v. EPA*, 861 F.3d 174, 187 (D.C. Cir. 2017).

EPA has long had a fraught relationship with the ESA. It has made a habit of registering pesticides without making the required effects determination. As pesticides registered without effects determinations pile up, private parties regularly haul

4

EPA into federal court to force ESA compliance. EPA has faced at least twenty lawsuits covering over 1,000 improperly registered pesticides. *See* Environmental Protection Agency, *Balancing Wildlife Protection and Responsible Pesticide Use: How EPA's Pesticide Program Will Meet its Endangered Species Act Obligations* 4 (2022). EPA's backlog even caught Congress's attention. In 2014, it directed EPA and the Services to file a report describing "approaches and actions taken" to streamline the FIFRA and ESA processes. Agricultural Act of 2014, Pub. L. No. 113-79, § 10013, 128 Stat. 649, 951. As a result, an interagency working group now regularly reports to the House Committee on Agriculture and the Senate Committee on Agriculture, Nutrition, and Forestry on its progress. *See* Agriculture Improvement Act of 2018 § 10115, 7 U.S.C. § 136a(c)(11).

The pesticide involved in this case, cyantraniliprole, provides protection from pests that feast on citrus trees and blueberry bushes. EPA classified cyantraniliprole as a "Reduced Risk" pesticide, a special category for pesticides it determines have a lower risk to human health and many non-target organisms. But in truth, cyantraniliprole poses a reduced risk to only some species. EPA's own risk assessment indicates that it is "slightly to very highly toxic to freshwater invertebrates; moderately to highly toxic to estuarine/marine invertebrates[;] highly toxic to benthic invertebrates; [and] highly to very highly toxic to terrestrial insects." Environmental Protection Agency, *Environmental Fate and Ecological Risk Assessment for the Registration of the New Chemical Cyantraniliprole—Amended* 57 (2013). Most significant for our purposes, EPA concluded that cyantraniliprole "ha[s] the potential for direct adverse effects to federally listed threatened/endangered" species. *Id.* at 5. Even so, EPA registered cyantraniliprole in 2014—without an effects determination and without consulting with the Services.

5

Cyantraniliprole's registration has come before our court before. In 2014, petitioners, the Center for Biological Diversity and the Center for Food Safety ("the Centers"), filed a petition for review under FIFRA to force EPA to make an effects determination and, if required, consult with the Services. *Center for Biological Diversity*, 861 F.3d 174. EPA willingly admitted that it "ha[d] not made an 'effects' determination or initiated consultation . . . consistent with the ESA and its implementing regulations." *Id.* at 188. After satisfying itself that it had exclusive jurisdiction under FIFRA to review cyantraniliprole's registration and after EPA's frank admission of culpability, it took this court only a paragraph to find that EPA had violated the ESA.

Despite the faulty registration, the Centers chose not to seek vacatur, an understandable decision given that our court determined that vacating cyantraniliprole's registration would "'temporarily defeat . . . the enhanced protection of the environmental values covered by'" the registration and encourage the use of older, more toxic pesticides in cyantraniliprole's place. *Id.* at 188–89 (quoting *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam)). The court remanded with instructions to EPA to replace the registration order with one "consistent with [its] opinion," *id.* at 189—*i.e.*, a new registration order signed after an effects determination and any required consultation. In the ensuing five years, however, EPA made no progress toward completing cyantraniliprole's effects determination—that is, no progress until earlier this year. Only then did EPA schedule cyantraniliprole's effects determination, though it took no steps to complete it. Matuszko Decl. ¶ 25 & n.22.

Unsatisfied, the Centers have returned to court, seeking a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651, to require EPA to finally perform its ESA duties. In support,

6

they argue that EPA is eight years past its statutory deadline, has failed to comply with our remand order, and is risking the health and habitats of endangered species. EPA responds that despite this near decade-long delay, it acted "reasonably by prioritizing development of a programmatic framework for addressing its pesticide program's extensive ESA obligations." EPA Br. 1.

Cyantraniliprole's registration owners, Syngenta Crop Protection, LLC and FMC Corporation, have intervened, arguing that vacating cyantraniliprole's registration would be "disruptive." Intervenors' Br. 28. Fortunately for them, although the Centers originally requested that we order EPA to complete its effects determination within six months with automatic vacatur if it missed that deadline, counsel for the Centers made clear at oral argument that they were no longer seeking vacatur because EPA has now committed to completing the effects determination by September 2023. Matuszko Decl. ¶ 25 ("EPA has committed to the following schedule for making effects determinations: . . . Sept. 2023[:] final effects determinations for cyantraniliprole."). The Centers now seek only a court order enforcing that deadline. Oral Arg. Rec. 4:14–19.

## II.

Mandamus is an "extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000). A petitioner seeking mandamus must first establish that the agency has violated "a crystal-clear legal duty." *In re National Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022). Absent a violation of a clear duty, this court is powerless to grant mandamus.

7

Violating a clear duty, however, is just the beginning of the mandamus analysis. A mandamus petitioner must show that it "has no other adequate means to attain the relief it desires." *In re Core Communications*, 531 F.3d 849, 860 (D.C. Cir. 2008) (internal quotation marks and alteration omitted). Moreover, a court may grant mandamus relief only when it also "finds compelling equitable grounds." *In re Medicare Reimbursement Litigation,* 414 F.3d 7, 10 (D.C. Cir. 2005) (internal quotation marks and alteration omitted). On the equities, the central question is "whether the agency's delay is so egregious as to warrant mandamus." *Core Communications*, 531 F.3d at 855 (internal quotation marks omitted). The "hexagonal" *TRAC* factors guide this inquiry:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

8

*Telecommunications Research & Action Center (TRAC) v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (internal quotation marks and citations omitted).

The mandamus petition in this case arises from relatively unique circumstances that implicate two distinct sources of mandamus jurisdiction under the All Writs Act: our power to compel unreasonably delayed agency activity and our power to require compliance with our previously issued orders. *See NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013) (frustration of previous orders); *National Nurses United*, 47 F.4th at 752 (unreasonable agency delay). In a standard unreasonable delay case, we evaluate an agency's delays in its own rulemaking or in responding to private parties' requests. *Core Communications*, 531 F.3d at 856. But here, we also face EPA's five-year-long failure to respond to our own order. When an agency ignores a court order, it creates a "different [problem]." *Id.* It "nullifie[s] our determination that its [action is] invalid" and "insulates its nullification of our decision from further review." *Id.* By ignoring our instruction to "replace[]" cyantraniliprole's registration order with "an order consistent" with the ESA, *Center for Biological Diversity*, 861 F.3d at 189, EPA prevents us from reviewing that new order. EPA has defied both the ESA and this court. The executive stands alone in opposition to both the judiciary and the legislature. In these situations, although the *TRAC* factors are "not unimportant," a lesser showing is necessary to justify mandamus. *Core Communications*, 531 F.3d at 855–56. That said, mandamus in this case is warranted even under the ordinary *TRAC* factors.

**III.**

Our analysis flows easily from this framework. EPA has a "clear duty" to perform an effects determination before registering cyantraniliprole. *Center for Biological Diversity*,

9

861 F.3d at 188. It has a parallel "clear duty" to obey our order. *Core Communications*, 531 F.3d at 856. And EPA does not contest that the petitioners lack an adequate alternative remedy. Nor could it: a writ of mandamus is the only way to compel EPA to perform its clear duties in this case. The sole question, then, is whether EPA's delay in undertaking an effects determination is "so egregious as to warrant mandamus." *Id.* at 855 (internal quotation marks omitted). It is.

Although EPA's failure to "heed our remand" is the "[d]ecisive" factor here, *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (per curiam), we shall nonetheless examine the *TRAC* factors, as we have in other cases. *See id.* at 837–38; *Core Communications*, 531 F.3d at 855–58.

Congress set a plain deadline (*TRAC* factors one and two). The ESA required EPA to issue an effects determination and engage in any required consulting *before* registering cyantraniliprole. 16 U.S.C. § 1536(a)(3). Eight years of outright non-compliance flouts the "'rule of reason,'" the "first and most important" *TRAC* factor. *Core Communications*, 531 F.3d at 855 (quoting *TRAC*, 750 F.2d at 80).

Attempting to evade this congressional timeline, EPA insists that its delay is reasonable, pointing to the effects determination's complexity, numerous competing obligations, and its new "programmatic approach" for pesticide registration. Such considerations might hold sway had Congress never set an exacting deadline. But when Congress imposes a timeline, that timeline "suppl[ies] content for th[e] rule of reason." *TRAC*, 750 F.2d at 80. Here, Congress has spoken.

Also weighing in favor of mandamus is the potential threat cyantraniliprole poses to endangered species. *TRAC* factors

10

three and five, which often "overlap[]," direct us to consider the effects of agency delay. *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991). Delay is "less tolerable when human health and welfare" is at stake, *TRAC*, 750 F.2d at 80, and ESA-protected species are "valuable to the health and welfare of the nation," *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 414 (D.C. Cir. 2004). The Supreme Court has made clear that "'it is in the best interests of mankind to minimize the losses of genetic variations.'" *Tennessee Valley Authority*, 437 U.S. at 178 (emphasis omitted) (quoting H.R. Rep. No. 93–412, at 4–5 (1973)).

True, we are in the dark about the exact threat cyantraniliprole poses. Indeed, that is precisely what the effects determination is designed to illuminate. But we do know from EPA's internal risk assessment that cyantraniliprole "ha[s] the potential for direct adverse effects" on endangered species. Environmental Protection Agency, *Environmental Fate and Ecological Risk Assessment for the Registration of the New Chemical Cyantraniliprole—Amended* 5 (2013). Completing an effects determination and any required consultation would reveal whether such a threat exists, and if so, its magnitude. If EPA identifies risks to endangered species, it could revise cyantraniliprole's labeling to include mitigation measures or limits on use. *See* 7 U.S.C. § 136j(a)(2)(G) (making it unlawful to use a registered pesticide "in a manner inconsistent with its labeling").

Echoing the concerns expressed in our court's previous opinion, *Center for Biological Diversity*, 861 F.3d at 189, EPA argues that vacating cyantraniliprole's registration would cause more harm by forcing more dangerous pesticides back on the markets and into our environment. The Centers, however, have abandoned their vacatur request.

11

The fourth *TRAC* factor, which instructs courts to consider "the effect of expediting delayed action on agency activities," *TRAC*, 750 F.2d at 80, generally cautions against facilitating line-jumping and reordering agency priorities, *In re Public Employees for Environmental Responsibility*, 957 F.3d 267, 275 (D.C. Cir. 2020). But here the Centers make no request for cyantraniliprole to cut the line. They ask only that we order EPA to complete its effects determination according to its own proposed schedule—by September 2023.

EPA argues that mandamus is unwarranted because a "'reasonably definite schedule'" such as its voluntary "commitment to a September 2023" deadline "represents a 'good faith effort by [the agency] to come into compliance with it[s] statutory obligations.'" EPA Br. 25 (quoting *In re United Mine Workers of America International Union*, 190 F.3d 545, 555 (D.C. Cir. 1999)). We, however, have reason to doubt whether EPA will meet its own deadline. For one thing, EPA failed to announce its commitment to the September 2023 deadline until *after* petitioners sought mandamus. Moreover, even the September 2023 date carries a caveat: EPA warns it may not meet the deadline because it intends to go through time consuming notice-and-comment rulemaking. Matuszko Decl. ¶ 25 n.15. As EPA acknowledges, however, it has no statutory obligation to do so, Oral Arg. Rec. 33:03–15, leaving us even more skeptical of its commitment to the September 2023 deadline. Finally, until at least 2030, EPA will make effects determinations only in cases where courts have ordered it to do so. *See* Environmental Protection Agency, *Balancing Wildlife Protection and Responsible Pesticide Use: How EPA's Pesticide Program Will Meet its Endangered Species Act Obligations* 4 (2022). As it explained, "any future court decision or legal settlement to complete an [effects] determination during that time will stretch the [a]gency's already very thin program capacity and may undermine EPA's

12

ability to meet its other ESA commitments." *Id.* at 26. In other words, EPA may be forced by a different court to prioritize another pesticide. For all of these reasons, "we cannot fairly describe [EPA's] schedule as 'reasonably definite.'" *United Mine Workers*, 190 F.3d at 555.

In any event, whether EPA's internal deadline demonstrates that it is acting in good faith is beside the point. We need not find bad faith to find unreasonable delay. *TRAC*, 750 F.2d at 80. No doubt EPA is now trying to meet its "numerous FIFRA-related ESA obligations," along with the demands of "other equally complex environmental statutes," armed only with "finite resources." EPA Br. 21. Nevertheless, "'[h]owever many priorities the agency may have, and however modest its personnel and budgetary resources may be, there is a limit to how long it may use these justifications to excuse inaction in the face of'" a statutory deadline and court order. *American Hospital Association v. Burwell*, 812 F.3d 183, 191 (D.C. Cir. 2016) (quoting *United Mine Workers*, 190 F.3d at 554). EPA has passed that limit.

Accordingly, we grant the writ. EPA is ordered to complete cyantraniliprole's effects determination and replace its previous order with an order consistent with the ESA by September 2023. To add bite to our writ, we will retain jurisdiction and monitor EPA's progress. EPA is directed to submit status updates every 60 days between now and September 2023. Should EPA fail to meet its September deadline, petitioners are free to renew their motion for vacatur of cyantraniliprole's registration order.

*So ordered.*